Please be seated. Good morning, everyone. We have four cases before the panel this morning, two of them being argued cases and two of them being cases which are submitted on the briefs without oral argument. Just for the record, I will note the two submitted cases. The first one is number 2007-3231, Robinson v. Department of the Army, and the second one is number 2008-3005, Burl v. the Merit Systems Protection Board. Again, both of those cases are being submitted on the briefs without oral argument. The first case in which we'll hear oral argument this morning is number 2007-5115, Klamath Irrigation District v. the United States. Mr. Marzulla? Thank you, Your Honor. You can start whenever you're ready. I'm prepared to start oral arguments. Judge Bryson and Judge Garza and I are both ready, so fire away. In the spring of 2001, the Klamath Lake was nearly 1,000 gallons of water. An acre full of water is about 326,000 gallons. Rough calculation, it held about 150 billion gallons in the spring of 2001. Yet, for the first and only time in the nearly 100-year history of that reservoir, the Bureau of Reclamation decided that it would not release a single drop of that water during the growing season for use by the farmers. As a consequence, the crop strip withered and died. This is an arid region which, without artificial irrigation, is utterly unproductive and fundamentally desert. Many of the farmers, of course, went bankrupt. Some lost their farms to foreclosure. When they filed this suit for the taking of their water rights and for the inheritance of their water rights under the Klamath Compact, as well as for breach of contract, they were met with, first of all, a motion for summary judgment asserting that they left a property right in any of the water impounded in a Klamath reservoir in 2001. The trial court granted that motion. Second, they were met with a motion for summary judgment arguing that, even if it were possible to have delivered some of that water to the Klamath reservoir in 2001, the impossibility of performance was not an element of the Sovereign Act defense, and therefore they were entitled to summary judgment on the contract clause. Let me ask you one question. I assume that both of your grounds, both the property issue, which gets us into the Matilla decision and so forth, that's a ground independent of your contract ground. Is that correct? That is correct, Your Honor. Think, if you will, of a property being stored, say, in a warehouse. The farmers own the water, which is located in the reservoir, but the reservoir is owned and operated by the Bureau of Reformation. And so there is a contract governing how the water owned by the farmers will be delivered to you. So they are separate and independent claims. There are four property rights which the trial court simply overlooked. Mr. Marzullo, aren't you making a basic assumption that the farmers own the water rights? How were those water rights developed? How did the title of the water rights pass to the farmers? I'm glad you asked that question, Your Honor. Several hundred of the farmers received patent deeds from the United States, in which the United States expressly granted to them both title to the land, which had formerly been held in the name of the for irrigation of the land. When were those deeds issued? Well, they were issued over a 50 year period, Your Honor. An example of those deeds is that of Robeson, which is standard term in FedEx 1491. Those deeds conveyed the water right which the government had obtained in 1905. As the court knows, and as we can see for purposes of this case, the government appropriated all of the water from the climate basement in 1905. It owned all of that water. It conveyed by deed its ownership interest in that water to those who obtained patent deeds, which are, as I indicated, several hundred of the climate farmers. How is that conveyance impacted by the Desert Act? I'm not clear how the Desert Act impacts that at all, Your Honor. The conveyance stands alone as a patent deed, as a conveyance which conveyed title both to land and to a water right. I don't think the government has talked about the Desert Act somehow invalidating or changing it. What I would point to the court is the government's own regulation 43 CFR 230.59, which said the patent deed in each case carries with it the water rights. But under the Desert Act of 1877, any patent deed which is issued by the government, the beneficial use of the water is not transferable. It's only the deed to the underlying land itself which is transferred by the government. I don't think it was as brief as this case. It was not. But it is my recollection that what happened under the Desert Land Act is that water rights were severed from the land so that a patent deed which did not mention water rights did not convey water rights. That statute, however, did not prohibit the government from conveying water rights. In fact, the entire concept of the Reclamation Act was to induce settlers to come to desert areas to purchase lands or to create farms on land which were otherwise utterly worthless, utterly unproductive. That land had no value unless it had a water right attached to it. And that's why, Your Honor, in Section 8 of the Reclamation Act, which of course is 1902, Congress required that any water right obtained for a reclamation project have the appurtenance to the land you're looking for. In light of the, as I understand your theory for the respective interests that were conveyed, are subject to conveyance under the 1905 Oregon statute, it is that the United States, upon beginning a project such as this one, holds legal title but that the beneficiaries, the ultimate beneficiaries of the project, the irrigators, have a beneficial interest and therefore the United States' title, legal title, but it's essentially bare legal title in that respect, held in effect in trust for the irrigators. I take it that that may be not as precisely put as you would, but that's the gist of it, is it not? Yes, Your Honor, I think you put it well and Well, if you have some qualification of the way I put it, go ahead, but I was going to ask you a second question on that. Yeah, my qualification would be that I've got some qualification as an indication. The 1905 notice posted by the United States on May 17th of 1905, claiming the water, that's what defines the United States right, said reclaim the water for irrigation and domestic use on the lands within the claimant project. That's the water right they got. Now, if that is true, and if anyone back in 1905 who was familiar with the background and so forth would have understood that to be the case, then what do you think was conveyed in the patents? Well, with respect to this group of homesteaders. Right. With respect to the homesteaders, in effect, the government was in effect, as a matter of real property conveyancing law and reclamation law, the water right, which attaches to the land, so that there would be no question that an individual like Mr. Robeson, and the other names plaintiffs here, received both title to the property and the appurtenant water right. But they would have already had that, if I understand your theory of the, they would have already had the beneficial interest by virtue of the 1905 statute after the project was initiated, right? What I'm struggling with is, is there an inconsistency in the characterization of the rights between what the patents purported to grant versus what the statute seems to have contemplated? I understand your question, Your Honor, and I think here's the answer. Mind you, until 1952, the United States owned title to the land they conveyed to Mr. Robeson in 1952. The United States then still owned both title and beneficial interest in the water right. When they conveyed it to Mr. Robeson, they conveyed their entire title. So the patent, this is only to people who were getting property, which had previously been owned by the United States, and therefore, and you say, what they got was the same thing that everyone else had, that is to say beneficial use, or did they actually get legal title? In other words, the derogation of the United States legal title, which was granted by the 1905 statute. The United States granted to them a right to use of the water. So the beneficial use, the beneficial right as opposed to the strict legal title, or is this meaningless to talk about? I think they actually obtained legal title to the water right itself at that point. Okay. And as the court indicates, there is one group of plaintiffs who obtained title from the United States by patent deed to the Homestead Act. There's another group of plaintiffs who obtained title from private parts or who were actually there originally. They are the ones who obtained the beneficial interest because they did not get a deed from the United States. They do not hold a conveyance that says you own the water right. You've straightened me out on this one. How can you acquire a water right from the United States unless you also have the perfected title under Oregon law? You have to perfect a water right under Oregon law, not under U.S. law. Is that correct? Yes, Your Honor. Well, perfected is sort of a technical term which involves the adjudication process. What the claimant got, what Mr. Robeson, for example, got was what the United States had. And what the United States had was this prior appropriation of a 1905 water right which, as the court knows, is now in an adjudication process that's been going on for about 30 years. What Oregon law provides is that those rights are enforceable now even though the adjudication process, perfection process, and issuance of certificates has not yet been completed and probably won't be in the near future. But how does, once again, how does the Desert Act apply which provides that patentees of public land acquire only title land through the patent and must acquire water rights and non-navigable water in accordance with state law? That's still very much a law in our statutes and is codified. And the Supreme Court has specifically ruled on that point. Let me try to answer that, Your Honor. Under state law, the United States obtained a water right in 1905. Thereafter, one of two things happened. Either the United States did or did not convey that water right in a deed which is effective under state law to the claimant. That is, I don't even understand the United States to say that it is prohibited by law, by state law or federal law, from conveying a water right to the claimant. That's never been an assertion, Your Honor. I'm not aware of any such case. In fact, of course, the Desert Land Act applied to all of the cases that we've cited, Ickes v. Fox, Nebraska v. Wyoming, Nevada v. United States. In every one of those cases, we had a similar situation in which the conveyance of the water rights was accomplished by the combination of the Reclamation Act and state law. But you did not have the Oregon type of a statute in those cases? The Oregon statute? The 1905 statute. Well, there is some variance among the statutes. Absolutely not. I go back to the point, however, that what the Oregon statute did was to authorize the United States to acquire a water right pursuant to, and in accordance with, the terms of the notice which it filed with the state engineer. That notice said it was acquiring irrigation rights for use on the planet's land. Now, one of two things happened when the United States disposed of those lands. Either the water right became useless because it wasn't attached to the lands, or, as we contend, it was attached to the lands. And as I say, what the government has failed to explain is how section 8 of the Reclamation Act, which requires that the water rights shall be pertinent to the land, can be reconciled in any way with its theory, which is not supported by Oregon law. Oregon law, of course, Oregon vice statute 540.510 states all water rights in this state are pertinent to the land. It doesn't make an exception for federal water rights. It's consistent with section 8. So there's no variance, if you will, Your Honor, between the two statutes. They are compatible, and the water rights attached to the land in Oregon act just as it did in the other states. Now, as we all know out in the West, the water rights not only have an appropriation, but there's also priority among the various appropriators. In 2001, when the alleged drought took place, wasn't there an allocation that was made by the government to other appropriators who were first in line, prior appropriators, such as the Indian tribes? Your Honor, it's entirely unclear. I think the government adopted an operational plan. The rights of the Indian tribes are not at issue in this case. The government has never defended this case by saying the reason you didn't get your water was because we gave it to the Indian tribes. The defense has been based on the endangered species act. So that, it seems to me, is the sole issue for this court. The rights of the tribes certainly exist, certainly have to be satisfied. They're not part of this case. And, of course, as the court knows, the trial court never got into the question of who would have gotten what, who was prior to whom. The question before the court, the sole question was, do these plaintiffs have a water right? I take it that your basing adjudication, which is, at this point, what we have is an administrative law judge decision, and I take it as subject to further review. But your position, if I understand it correctly, is that that is directed at resolving the question of title, but does not address the nature of the beneficial interest or the existence of the beneficial interest in the irrigators. Is that correct? That's exactly correct, Your Honor. Which is to say that regardless of how that is ultimately decided, it doesn't affect this case. Yes, that is correct, Your Honor. And, of course, it's who had title back in 1905. The adjudication obviously doesn't look at everybody's deeds to try to figure out if the United States was conveyed, but rather just figure out who had title originally. Right, but that's all. It's not going to adjudicate the question that we're struggling with, which is whether the beneficial interest exists and what its nature is. That's right. The state issues one certificate, it puts it in one certificate, and that is the issue. Well, let me ask you a procedural question. In your brief, I believe in the footnote, you suggest the possibility of us certifying to the Oregon Supreme Court, as we did in Chevy Chase Land Company to the Maryland Court of Appeals, the property law question, the 1905 statute, et cetera. The government comes back and, I think, acknowledges that certification is contemplated by the Oregon statute that says we shouldn't do it. I have just two questions. One, I think the Maryland, the government says that, well, the losing party, if you will, in the lower court cannot ask for certification. What is your response to that? Have I got it correct, what they basically say? You do, Your Honor, as we understand it. The cases they cite are diversity cases, which is sort of interesting. This obviously isn't a diversity case, but it's an interpretation of Oregon State law. And although there is some validity in what they say about those diversity cases, the fact here is that the application of this 1905 statute was not an issue that was even briefed by the courts. The trial judge sort of brought it up a little, if I may, like the business land act, that I think it was a private problem of, and had the issue, I think, been raised earlier, we might well have suggested that certification. We think that if the position of the government is that the 1905 statute vested all rights in the government, the government is forbidden from conveying those rights to anyone, and the plaintiffs cannot have any water right, whatever, at any time under Oregon law, then that is a question that really ought to be certified to the Oregon Supreme Court. That brings me to my second question in that regard. If we were to contemplate a certification to the Oregon Supreme Court, what do you state should be the focus of our certification specifically? What should we ask the Oregon Supreme Court to do? Because in looking at the statute, the Oregon statute, it asks the certifying court to kind of focus it. What would you say our focus should be if we were to do that? I appreciate your honor using the word focus and not holding me to the specific words. But I think the focus of that certification should be to ask the nature and extent of the water rights obtained by the United States in 1905, and then whether that water right also contemplates any beneficial interest in the landowners, whether the water right is pertinent to the land under Oregon law, and whether it can be conveyed under the patent date. Something along those lines. I do have one other question, if you don't mind. If we could turn for a moment to the Sovereign Acts Doctrine. The trial court, as we all agree, understood the Sovereign Acts Doctrine not to require a predicate finding of impossibility. Do you think that it's fair, however, to read the trial court's opinion as concluding that even if impossibility were incorporated into the Sovereign Acts Doctrine, per Justice Souter's opinion in Winstar, that the requirements would be met by the trial court? And here I have reference to the discussion of the conclusions that ultimately had the government determining that they had to take this measure under the ESA. Your Honor, no, we do not think that the trial court either found or had before it undisputed facts on the basis of which it could find that a full lake did not allow the distribution of a single drop of water, that there was a legal prohibition. Now this gets to the real, the crux of what my question was and it's really a sort of a follow-on question that really strikes me as a critical issue. What should the inquiry be? You've suggested that they made a mistake by thinking they were going to help the fish by keeping the lake up, and now does that, let's assume that they determined that they needed to keep the lake up, but it was a flawed determination. That is to say the Department of the Interior concluded, based on all the information they had, that they had to take these steps. They were compelled, let's say, by the ESA to take these steps. Is that determination subject to challenge, factual challenge, as part of the showing that the impossibility of defense was not satisfied? Absolutely. Impossibility, of course, is not a concept, Your Honor, in defense that is limited to the federal government. In fact, the whole purpose of the Sovereign Act doctrine is to place the government on a par with a private party. So if you look at an example of a private party who says, gee, I thought I could deliver your water, but you know what? I was wrong. I actually could have done that consistent with the statutes and it wouldn't have hurt anything. That party has not sustained its burden of proving the affirmative defense of impossibility. But here we have a statute which, as I understand it, says if you make this determination, determination X, you may not do Y. The determination is made and that the Y was then not done in this case, the release of the water. And the question then seems to me a little more complex than the example you are foreclosed from acting. And the question I have is, do we convert the proceeding in the Court of Federal Claims into what amounts to an APA review of the correctness of that determination? It seems a little counterintuitive. If I may, Your Honor, if you were correct in the initial premise that the Endangered Species Act required the parties to act in a certain way based on filing, then that argument might, I was going to say hold water. But you don't, you think the EESA doesn't require that at all. The Endangered Species Act did not compel reclamation to act in a certain way. It's a little bit like the Environmental Impact Statement requirement. It requires a entity to provide its opinion to the Bureau of Reclamation, but it leaves the Bureau of Reclamation free to make its own determination then, as to how the Bureau of Reclamation will carry out its own activities. But, and in this, one further question along this line, would the Bureau of Reclamation be free to say, all right, you've submitted to me overwhelmingly clear evidence that if we lower the lake it will destroy these species, but we have the freedom to choose to do that, to go ahead, and notwithstanding that we agree with you, the species will be destroyed by our action, but we can do it Yeah, okay, so it's merely a question of providing them with information which will inform a decision that they're free to make either way? That is exactly right. That's the latest answer. So we really are in a situation, your submission is, in which there couldn't be impossibility, I take it. Not only wasn't shown, but you're really saying there couldn't be an impossibility defense in a case like this? There could be a practical impossibility in this sense. There is a prohibition in the Endangered Species Act against the taking of endangered species. If the Bureau of Reclamation were able to prove that the delivery of the water would have resulted in a violation of the Endangered Species Act by the taking When you say the taking, when I said the destruction of the species, I was trying to say that the Bureau of Reclamation would know that the species would become extinct within a very short period of time if they took that action. Does that constitute a taking for purposes of the act? Well, if the information were accurate. Let's assume it was accurate. Actually, the take is broader. It doesn't require that you go so far as to extinction the species. I may have misspoken in putting out the question, but where I'm trying to go is if there is a determination that the species will either clearly become extinct or be gravely disadvantaged, then there is a duty, I take it, on the Bureau of Reclamation not to take the action that would have that effect, correct? Not exactly. The prohibition that I referred to, first of all, as we discussed, the determination by the fishery agency is not binding on the Bureau of Reclamation. The Bureau of Reclamation makes its own decision. What is prohibited under the act is the physical, actual killing or injuring of the species. If the Bureau of Reclamation said, I didn't deliver the water because I was afraid it would injure the species, that's a fact question. That's the relevance of the National Academy of Sciences report, which says you wouldn't have injured the species. We've moved on to the factual question of whether the determination that the fate of the species was in the balance here was correct. Just to make sure that we're on the same page, setting aside the correctness of that factual determination, if we assume that it was unimpeachable, that that effect of lowering the water would have the effect of destroying the species, are you saying that the ESA would prohibit the Bureau of Reclamation from taking action? It would prohibit the take of the species and that would be an impossibility. In that respect, it is different from NEPA. All NEPA is is information, as I understand it. ESA actually has some teeth in the sense that it says you may not take these steps. A, you need to be informed and B, once you're informed and you are told conclusively that this is the case, you are barred from taking action. A is correct your manner. B is really quite independent. That is, I take an endangered species. If you or I were to go out today and take a sucker fish out of the water, that would be a violation. There's no requirement that you consult. There's no requirement. Anything else. That's the prohibition that I'm referring to. Now, admittedly, what you're saying is well, gosh, Reclamation had all this information and a lot of people thought that this was going to injure the species. They had a lot of contrary information as well. Their best guess was it's going to injure the species. As a matter of impossibility defense, who bears the risk of that decision being wrong? It's a defense. It's a contract defense. And if you have a private party who says, gee, I thought it would have been illegal for me to deliver the water to you, but I was flat wrong. That private party doesn't have an impossibility defense. So the government has to establish the same defense as a private party does. I know I overstayed my welcome. I did want to mention that. You have another stage of welcome. You continue to be welcome until we run out of questions. Hypothetically, assume for the moment that the United States could not transfer the water rights, which it has obtained under the 1905 treaty. It was all done for distribution of water pursuant to a contract. In 2001, they failed their obligation in the contract. Would you at that point have a contract right for a violation of the contract? Yes, sir. And not a water rights taking at that point? Yes, that's right. Well, there are actually two different things, as I indicated. It's a bit like having goods in a warehouse, or you're storing water in somebody else's facility. If they convert those goods, that's one time. If there was a duty to deliver those goods on a particular day and they didn't do it, that's a separate breach of contract. Well, if you convert the goods, that's a conversion of property that you would own. I'm taking the assumption you do not own the water rights. The water rights are still owned by the United States. And any diversion which they make is made pursuant to a contract between the water irrigation groups and the United States. Their failure to deliver under those contracts would be a contractual failure. That's correct. Not a property taking. That's correct. Absolutely. So the entire issue then turns on whether or not that property right is passed to the homesteaders or to the property owners. That is absolutely right, or whether, if I could put it a different way, whether they own any of the water in the reservoir. And that's why I was going to mention the three districts that have separate water rights. That is, the two that have permits from the state of Oregon themselves, the Plymouth Drainage District and Plymouth Hills Drainage and Irrigation Company, and the Van Der Mer Ditch Company, which actually has an 1883 water right, which the trial court, and I refer the court to page 31 of the opinion, says the United States recognized that Van Der Mer has a right to 52nd feet, which is a measurement, I'm not sure exactly what it is, 52nd feet of water. And yet the trial court still held that Van Der Mer doesn't have a property right. That's why I say the court overlooked these various rights. Mr. Marzullo, thank you. Thank you, Your Honor. Before we hear from the government, I just want to equalize this out on the time here. Mr. Marzullo had his 15 minutes plus basically an additional 20 minutes, and we will restore his three minutes of rebuttal. So that would mean he will have a total of 38 minutes, if my math is correct. And we'll allow the government the same amount of time, obviously, if it needs it. And we'll hear from the government now, Ms. Barton. So as I said, you have the same amount of time if you end up requiring it. That helps me know I don't have to talk really fast. Okay, no, no. Which I tend to do anyway. The United States does not dispute that the accountants have an interest in the beneficial use of water from the project. Those interests are all derived from the contracts of the United States. All of the water that is delivered to the accountants and to the people in the project are delivered pursuant to contracts. And those contracts have provisions for how much water they get, when they get it, what their obligations are to receive it, and all but one have provisions that limit the United States' liability in terms of the water shortage. You say that they have interests, but it's important to distinguish between interests that are property in nature, which triggers the takings clause. You're saying that there's no takings clause application here, if I understand your argument, because it's all contract, and contract in the sense contract remedies prompt the availability of taking in this setting. That is our position, that they do not have any property of interest. But I think it's important to look at... And therefore, no taking. And therefore, no taking. But this court has held, as the CFC recognized in citing the Sun Oil case in its 2005 takings opinion, that where the government created through contracts, there was an oil and gas lease in that case. That oil and gas lease was recognized as a property interest, but the rights in it were defined. It was created and defined by the terms of the contract. And the court determined that it should be... When rights are created and defined by... A claim for infringement of those rights should be analyzed as a contract right. There are contractual remedies. You have a contract, there are contractual rights, there are contractual remedies. So, not to entirely negate the importance of the question here of property rights, but for the appellants to claim that they have an absolute property right that isn't subject to all the terms of the contract, including the water shortage provisions, or the United States contractual exemptions, there's really no legal support for that position. That they can just... That we can... They can enter... Whatever beneficial use they have, it's pursuant to terms of contract they have in the United States. Even the patentees, they had to fill out this Form A application, as we discussed in our brief, which had the very same kinds of provisions that are in all the other contracts that cover... More than 250 contracts that cover the water... The delivery of water within the project. So, there's... These terms, it's all defined by contract. In fact, Congress provided that that's how everyone receives their rights, their rights to water under the project. It's all these... And the CFC judge went through in detail the varying... Development over time, the varying approaches to different kinds of contracts that Congress came up with to meet, sort of, as the development of the project proceeded. Is this true also for rights which were obtained prior to 1905 by the various irrigation districts? Excuse me. Was this true also for the rights which were obtained by the various irrigation districts before 1905? Well, there are... Van Brimmer is an irrigation district, and there are several individuals that had their rights folded into the project. Their pre-1905 rights folded into the project by virtue of contracts with the United States. Did they lose their appropriated rights under the 1905 Act? There is a dispute over that with the Van Brimmer issue. We maintain that their rights now are purely pursuant to the contract, but that dispute is actually at issue in the adjudication. The claimant's adjudication is the person who has title to the right, and therefore it is precluded by the November 13, 2003 order of the CFC as not being a part of this case, because it is a claim, and you can read the proposed order where it is addressed. That was separated out, as I understand it, from the determination made by the CFC. It was separated out, yes. Now, is that subject... By the CFC, no, I'm sorry, in the proposed order. It was... The CFC did not separate out Van Brimmer. It treated it the same as the contract, because it still, it does have a contract... So, what about the administrative proceedings that are taking place in Oregon? Yes, those... Are those included in that? Excuse me? Are those included in the administrative proceedings? The Van Brimmer rights, yes, that is what I'm saying, is that that very right, that very issue is at contest in the administrative proceedings in Oregon, in the adjudication. That is... I mean, we maintain, actually, that basically all the state law claims, because there isn't such a thing under Oregon state law as a beneficial property interest that is different from title to the appropriated right, that we maintain that all of that argument actually is something that is being determined in the adjudication and isn't before that court. Even if you separate out the sort of beneficial interest argument, the Van Brimmer rights are based on a claim to a prior right. Well, now, the adjudication, the administrative law judge, and we may be getting into a problem of nomenclature here, but the administrative law judge seemed to focus on the difference between title and beneficial right. At one point said, this is not to say the water users do not have any rights in the water. Even the United States recognizes the water users have beneficial right to the water. Now, I take it that you would say, well, that's really a way of describing their contract interest. Right. Although beneficial right sounds a little different from a court contract. Interest or right, these are perpetual contracts. We're not denying that they have rights. But if I understand what you said in response to my earlier question, correct me if this is an unfair characterization, it sounds like what you're saying is it doesn't really matter what Oregon law regards as the property interest here because it's all been subsumed into contract. And there isn't anything the Oregon Supreme put it this way. There's nothing the Oregon Supreme Court could say about the Oregon statute that would change anything about the posture of this case in as much as, about the property interest that may or may not have been retained or ultimately distributed to the landholders. Those landholders have no property interest at this point except to the extent that you refer to their contract interest as property interest. Is that a fair statement? It's a long statement. You may not want to sign on to all the dependent clauses. Our position is that any rights they have, property or not, are pursuant to the contract because that's how they got beneficial use of their water. And the contract terms and contract remedies are all that they should be able to obtain just as where they in some oil got an oil and gas lease pursuant to a contract with the United States. Okay, well let me put the question a little differently then. Maybe this is something that would be more precise in response to what you're saying is that regardless of how you characterize their interest in their property interest, all they've got by way of remedy is contract remedies and all the contract remedies are going to be the same without regard to what their property interests may ultimately be determined to be. Is that correct? That is consistent with this court's approach to assessing what to do when rights are determined. And that's your position here? Yes. Okay. Yes. But not to completely give the proper argument, let me say first of all... Well, let me ask you in that regard, what is your main objection to the concept or the idea of a certification by us to the Oregon Supreme Court? I mean, I know you say in your brief that the party that was on the losing side below cannot assert it, but leaving that aside, assume for the moment, and again it's hypothetical, the court felt that in order to reach a decision, in this case the guidance of the Oregon Supreme Court would be helpful, whichever way it came out. Is there a particular objection beyond that that you have? Well, let me just suggest a couple of ways in which it might not be all that helpful. I mean, obviously if the court thinks it's helpful, then we have no objection. I mean, the court should certify. First of all, the Oregon Supreme Court in the Umatilla case addressed the question whether the United States, whether the water had to be put to beneficial use to be appropriated, to become a perfected water right in Oregon under the 1905 statute. When it said that the United States had the right, was the appropriator of the right, it was defended against adverse claims by anybody else, which is the nature of a right that's been perfected, and it didn't matter whether it was even more water than they could put to use in the project. So that question about the powers that were aligned, that maybe the 1905 Act actually left open the question that you still had to have beneficial use for a water right to become conclusive, has really been addressed by the Oregon Supreme Court. Second, the question of who has ownership of these rights is at issue in the adjudication. But there are some arguments they're making here. They're making in the adjudication, and they have lost so far. In Idaho, actually, where the farmers claimed an interest, an equitable interest in the water, that was in the context of an adjudication. That case, the Pioneer District case, that appellant's site, is in the Mink River Basin adjudication, and the title to the water right was awarded to the farmers based on Idaho state law. So it is a question of title. We maintain that it is a question of adjudication. But putting all those aside, then, of course, certification would be possible, except to get back to the point that I was making with Judge Bryson, which was that we still have the question of whether that borders contract defenses or limits the rights of the appellants to the terms of the contract, including the water shortage clause. Which you think it does. It limits them. I mean, they are limited to the contract. Which I thought your answer to Jim Shull would have been, you're wasting your time by sending this case to the Oregon Supreme Court, because it doesn't matter what they say. That was my last answer. Maybe you were being more polite than my response would have been. But yes, that would be, is that our position is that, in a sense, so what? Their rights are all defined by contract. They are based rights. Just for the moment, I have a question. If one were inclined to contemplate a certification, what, if anything, would you have to say with respect to what Mr. Marzullo said should be the focus of the certification? I know it's a little difficult. You're sitting there. But what would you, let me ask it this way, rather than ask you to key into what he said. If one were inclined to certify this to the Oregon Supreme Court, what would you say should be the focus of the certification? Well, the question would have to be the rights obtained under the 1905 Act and whether, I mean, I am making this up. Oh, no, I understand. It's a grafting on your feet. Anyway, I think it would be, you know, whether the perfection of that right required the beneficial use by the individual on individual properties and, as a consequence, vested the, I guess, the equitable title in those users. Now, another point is that the Oregon courts have also addressed under another statute and under common law whether a party that develops water for the use of another can be the owner of that right. And they have said yes. The 1891 statute that we discussed in our brief is another statute, the Brown v. Brown of the 1905 statute, that provided specifically for the development of water that should be rented or sold to other parties. And in the Walla Walla Ditch decision and the Deschutes River decision that we cite in our brief, neither of which opponents respond to, the Oregon Supreme Court held that you could, that the water, the procreator could develop water for the use by another and would hold the right. And that would also be in the Nevada Ditch. And the Nevada Ditch is the common law. That's a common law issue. Let me ask you a question. With respect to the property right which was established in 1905, as the Umatilla decision showed, where does the fact that some of these folks did take a patent from the government, giving them the homestead right with the pertinent water, does it have any impact on that? We haven't briefed that. I'm a little surprised at the federal government. Why doesn't it? Governor, those lands, the lands we're talking about under patent are about 20% of the land in the project. The rest of it is not. And there's only like three claims in this case based on patent fees. That, the patent rights were obtained, oh, I know, they were, those lands were reclaimed. They were under water and reclaimed as part of the reclamation effort. And then homesteaded. And I think they come under the reclamation act. They don't fall under the Homestead Act? Whatever Homestead Act was involved. But aside from that, let me say that what the patent conveys, as you can see in the record, it conveys the use of water as an apartment. Well, an apartment is just an attachment. And the use of water begs the question of what use of water did they get? What kind of rights did they get? In order to get those rights, they had to fill out a form and application. With respect to the land rights, they get the land, they get the water. But under state law, in order to perfect an appropriated right, you have to file with the state. The state can give it to you. Right? Can the government, the U.S. government, under the 1905 provisions, transfer its rights, its interest in the water, appropriated interest in the water to others, without them filing a perfected appropriation document with the state of Oregon? I think the United States could probably transfer its rights, but if it didn't, it would be transferring title to the right, and that is exactly what's at issue in Oregon adjudication. You don't disagree with Mr. Marzullo, do you, that the Desert Land Act does not prohibit the federal government from expressly conveying title to water? To the extent that I'm aware. Right. It just speaks to when there's silence with respect to the disposition of water. I mean, that's not the basis of our argument, and we certainly don't need to go there. All of what they got here, anything they got through the patents was pursuant to the Form A applications, the terms set forth in the applications. And there's really, there's no reason to think that the Reformation or Congress intended the 20% of people that happened to be on the land that the United States developed itself here and declaimed to have totally different rights from all the other farmers, their neighbors, who had to fill out the Form B application in order to obtain delivery of water from the project, and that one was supposed to get a permanent water right  and the other 80% of the land in the project was not subject to it. I mean, there's no, the patents don't convey, the patents just say an impertinence. The use of water is impertinent. They don't define what the use of water is. That use is defined in the contract. But once again, in the revision act, the water right that's impertinent has to be established in the state law. So if it's not established in the state law, there's no water right to that particular homestead. But I don't know that Judge Breslin may be correct about the transfer. We could try to provide the funding, but we don't know. We probably really ought to visit that. It's your experience to me that probably, to unite, it would still be a right they got from the United States, but now they withhold the title. And we could sell our rights. We could give it away. I mean, I don't know. I'm sorry. I want to adopt it as a useful argument, but I'm not. Did you give it away in this case? No. As I say, it's a contract. Right. They have a perpetual right to water pursuant to the terms of the contract. With respect to the ESA, once the Bureau of Fish and Wildlife makes a determination of the particular fish or wildlife that's involved, and they make an extension certification, and it goes to the Bureau of Reclamation, is the Bureau of Reclamation required to follow that, or they can start all over again? Well, the Bureau, just looking at the ESA alone, and not all the circumstances on the ground yet, which also matters here, the Bureau is required under the Endangered Species Act to ensure, to consult, to ensure that actions undertaken by or authorized by it do not jeopardize the continued existence of the endangered species. So, in theory, if the Bureau could make an independent determination that actions other than what the Fish and Wildlife Agency stated would not jeopardize the endangered species, they could make a different decision, but they do have to ensure that their actions do not jeopardize the continued existence of an endangered species, so they have to have their own scientific rationale and their own basis for making that determination. But, there's another very, very important matter here, which is the question of a take, and that is when the National Marine Fishery Service here issued its biological opinion, it said there's no jeopardy as long as you do these things, and as long as you do what we say, then you get an incidental take statement, which protects you from liability for a take. And the Supreme Court in Bennett v. Speer actually characterized, therefore, a biological opinion that had an incidental take statement as a final agency action because it affects the rights and liabilities of the entity that gets that statement because it gives it protection. So, here, the Bureau could have been liable. The Bureau is effectively coerced. They find that the biological opinion was that it wouldn't have had any take protection. It would have been liable for any take of the fish to happen. Now, I'm also looking at the circumstances around me. Well, but you're saying they still had freedom to make a judgment. They just made a judgment which gave them freedom from potential liability, exposure to liability. But they were free to say, well, we're not impressed with that finding. We think, in fact, exactly the opposite is the case, and they could have gone their merry way and released the water. In theory, but that's where we get to the circumstances on the ground. I mean, where we're going with this, obviously, is towards the whole question of impossibility. Right, right. So, all right. Good, good. You know, the Bureau was under a court injunction not to deliver any water over specified minimum levels unless it consulted to a no-jeopardy opinion with the National Marine Fisheries Service. And the Ninth Circuit law has made abundantly clear that the interests of the ESA are primary over the interests of the water users in the project. There is no way that the Bureau... The Bureau knew that if it... This was all happening in the course of a month, also. The injunction came out in April, and the water deliveries were supposed to start if the Bureau consulted, got some biological opinion, and determined that it should implement it in order to potentially not be under the injunction, now it turned out. The Bureau couldn't deliver the water anyway. But it couldn't have delivered water if it hadn't accepted the opinion. Right? I mean, the court would not have had a no-jeopardy opinion. I mean, it would have had it, but the court was... There's a nicety between the Bureau saying, well, we've got a no-jeopardy opinion, but we're not going to follow it. We don't have our own science to come up with something else. The court would not have sustained that. So I think all... Would that have been in contempt of the injunction? Excuse me? Would that have been in contempt? Was the injunction framed in such a way that such an action would have been in contempt, or would it simply have invited further action from the court, in your view? I don't know if it was specific enough that it would have been contempt. You know, it would have been... But the point here is that the Bureau has... It's part of... The Bureau's decision is part of the sovereign act. Well... That shouldn't be... But... The Bureau is... The Bureau is required by the ESA, as a federal agency, to consult and ensure that action is undertaken by it and do not jeopardize the continued existence of endangered species. Now, if the Bureau... The whole point of the sovereign act stuff is to put the Bureau as a proprietor in the same position as the private party in that position. I mean, you can look at the water districts. The water districts have a sovereign act, which is the Bureau's decision that it can't deliver water under the Endangered Species Act. That's why they are protected. But if that's not the case... I mean... The Bureau... Just because the Bureau has two functions here, it doesn't... For its role as proprietor, determining that once it complied with the Endangered Species Act and took actions to ensure that it would not jeopardize the continued existence of the endangered species, that Ben, as proprietor, had to... It was bound. But it was bound... Suppose the following. Suppose that instead of this elaborate factual determination that was presented to the Bureau of Reclamation, it was simply a case... We'll be silly here. It was a case in which someone in the Bureau of Reclamation read an article in, say, the Sierra Club magazine saying that these species will be endangered by any reduction in the level of water. And the Bureau said, You know what? We think that's probably right. And therefore, close the canal, lock the dam. You think that that would be sufficient as a sovereign act to protect against any liability for breach of contract? And under this sovereign act doctrine, like a common impossibility doctrine as applied to private parties, the sovereign act does not have to be valid. The sovereign act does not... But I guess... Let's make sure. Is your answer yes, that would be fine? My... Well, I have two answers. One is that perhaps... Perhaps it would be fine from the point of view of the sovereign act doctrine because the private parties faced with the Bureau making that decision would say, Hey, that was a sovereign act. You know, if the Bureau or somebody... Another agency in the Bureau made an arbitrary decision. But where I'm going with that is that the proper place to challenge arbitrary decisions of agencies in an APA lawsuit in district court, which, in fact, some of these opponents brought in the Canberra case and only took it to the preliminary injunction level, which was denied because the court, the district court, determined that it was not arbitrary to put this for the purposes of preliminary injunction for the Bureau to make its decision. If the courts look behind the validity of the Bureau's decision, it's really to take on an APA kind of review role that the CFC is not authorized to undertake because it's all part of the sovereign act. Once you get to the end of the sovereign act, then you say, was the agency precluded by the sovereign act from performing? That would seem to me to take an awful lot... Let's assume, for present purposes, I know it's contested, that impossibility is part of the sovereign act doctrine for Justice Souter. It would seem to me, if you're right, that all the agency has to do is to announce that this is their conclusion as to what they think they're bound to do in order to effectively render the performance impossible as a legal matter. That seems to me takes an awful lot out of the impossibility defense. In effect, makes it available very broadly. Doesn't it? It's awkward, too, because we have the same agency in two roles, but that's not usually how it happens. A court wouldn't look behind Congress' enactment of a statute and whether it could have done something else that would have less impact on contract rights across the nation. As long as it's a public and general act that's not targeted at a government of self-interest and self-relief, it is a sovereign act. If the sovereign act is not valid, then the proper place to challenge that is in an APA lawsuit. There's an avenue for that. It's perfectly challengeable, and they tried to do that and just weren't successful, so then they thought, take it from there. I really do think, and if you had a private party, as I said, in the same position, say the Bureau leased operation of the whole project, and in fact, it sort of does to the irrigation district, and it made this decision, and then the party that had to deliver the water wanted to use an impossibility defense, it would say, there's a sovereign act, but we can't help it if it was arbitrary and capricious. It prevented, I just feel, it's awkward in this case because it's the same agency, but I think when you look at the whole purpose behind the sovereign act and how it continues to operate. I wanted to say that I don't think, this isn't a question of whether impossibility pertains to, we weren't denied that once the sovereign act, whatever sovereign act is, whatever act Congress does or agency does or whatever that is the sovereign act, we have to show that that made it impossible or caused us not to be able to meet. Oh, you do. I mean, I had understood your footnote in which you incorporated or referenced, I think, the amicus brief, which does take that issue on. I understood that you were endorsing that position. Maybe I was misreading it. I knew that they were going to have a much, well, we don't believe that the common law of impossibility is important as a whole, but the sovereign act doctrine itself, it doesn't really make any sense if it wasn't that we had to show that the sovereign act meant that we couldn't perform. I mean, of course, that's what we have, that's what the sovereign act doctrine is all about. The sovereign act doctrine causes the government, the sovereign act causes the government to provide or not to be able to perform and sometimes in our briefs we've said it makes it impossible for us to perform. But the whole issue that the CFC got into about importing the rest of the doctrine of common law of impossibility has to do with interactions with the unmistakability doctrine and who assumes the risk in contract and that. We think unmistakability doesn't apply. They haven't reached that and haven't raised it. It's really not an issue. So are you adopting then Justice Souter's position in Munster? No, no, because I think Justice Souter's position I believe is focused on the other aspects of the common law impossibility defense, not just the question. I mean, I think maybe it would, no, absolutely not. Well, I may be missing a subtlety in your earlier answer, but I thought you were saying that yes, the Sovereign Acts Doctrine does, it gives this much and no more. It's Justice Souter's position as I understand it. It gives the government a defense against the human law principle that one cannot render oneself action by one's own actions render one's performance impossible. That much everybody agrees it does. The question as I understood it over impossibility was whether it's still necessary for the government in order to invoke the Sovereign Acts Doctrine to say you may not do X. And then the agency comes in and says we have no choice here. Well, you could have a situation in which Congress could say agency, you now have a choice as to whether to do A, B, or C. And the agency says, you know what, I think we've been given an option by Congress either to save the fish or let the farmers have the water. I think we'll save the fish. And the argument would be that's fine. The Sovereign Act of giving the agency choice has defeated the contract claim. So, you don't adopt the latter. Well, not to the extent that the agency's action is part of the Sovereign Act. I mean, here, the Endangered Species Act requires the agency to ensure that its action is going to jeopardize the continued existence of Endangered Species. It's the  the Sovereign Act. And where is the impossible? Then are you saying that Congress has said to the agency, you may decide to cut off the water or save the fish. And the agency says, I'm sorry, cut off the water and save the fish. Then end of inquiry. That's a Sovereign Act and there's no remedy? We're dealing here with a principle of law as to what exactly we mean by Sovereign Act doctrine. I think you're saying, as long as the agency itself makes the determination, notwithstanding it wasn't compelled by Congress, that's a Sovereign Act which allows the agency to stay too bad to the contract. I think there could be decisions that the agency makes as a proprietor, not as a sovereign act. That's the difficulty here. Here, clearly, the Endangered Species Act, it wasn't the Bureau just sort of thinking, well, we think maybe we ought to do good to the fish so we won't deliver some water. No, obviously, nobody intended it. It doesn't arrive at how far agency discretion constitutes a sovereign act. I don't have an answer to that question. But here, it was bound not to jeopardize the continued existence of fish and it got expert opinion from the fisheries and had no basis for second guessing that, didn't have its own scientific determination and it had the pressure of the injunction and the Ninth Circuit case law and it also had a duty to the tribes to protect the fish. I mean, there are just numerous, numerous things going on here. The Bureau, that's outside of the ESA, was compelled under the rubric of the ESA, not to deliver the water. That is our position. It was compelled